Good morning, Your Honors. May it please the Court, Rebecca Jones appearing for Appellant Charles Thomas. The first time 18-year-old Charles Thomas, who had attended special education classes during his school career and had to obtain a GED, was ever interrogated by police. He was told that if he did not confess to robbing Ruth Lewis during an encounter that ended up in her being murdered, he would be laid down on a table to take a couple of needles. He would be subjected to the death penalty. He would walk the yard at CDC for the rest of his life. He would be raped and sodomized in prison. He would be kissing his whole life goodbye, and he would be putting a rope around his neck and hanging himself. He was told by police officers that the only way to get a chance in life is to fess up. Mr. Thomas was also told that his partner in crime had confessed, and because of that, the partner would be out of prison in time to get a few new tattoos, while Mr. Thomas would either be executed or imprisoned for the rest of his life. Less than two minutes later, Mr. Thomas confessed to participating in a robbery that ended up in the murder of a woman and subjected him to a capital murder prosecution. To prepare Mr. Thomas for this onslaught of threats, two older, seasoned, and large police detectives softened him up by speaking to him for 20 minutes before getting him to waive his Miranda rights. They elicited from him a promise to speak to them before they gave him his Miranda rights. Some of us have seen the videotape of the actual proceedings here. And I'm not sure that it's a fair depiction to say that these were big. What did you say? Big, large, large, large body detectives who were overbearing on him. That certainly was not the impression I got from seeing the videotape itself. I have to say, with all due respect, I was just reviewing the videotape this week, Your Honor. And I look at Detective Wolfe, and from the back, he's got this broad back. I mean, he's seated, but he's got this broad back, and he kind of somehow gets over Mr. Thomas during the interrogation. He's in that rolling chair, and he pushes him forward. Yeah, the chair goes up to the table because they were looking at the map. No, I understand that, but I'm saying the video camera's behind Detective Wolfe. At a very high angle, so it's hard for any of us to figure out exactly what size we're talking about. I understand what you're dealing with. Yeah, I mean, do we have a record that says, you know, Mr. Thomas was 5'6 and 130 pounds, and Detective Wolfe was 6'2 and 200 pounds? No, but my impression. But your argument really isn't physical intimidation. It's really mental intimidation, is it not? And these offers of these threats? What is your strongest argument that the State court ruling was an unreasonable application of Federal law with respect to the Miranda issue? Well, actually, I think our strongest argument, frankly, is on the voluntariness issue on the Miranda. But the Miranda issue sort of weaves in with the voluntariness issue because, as this Court well knows, when you're looking at the totality of the circumstances to determine whether a confession is voluntary or not. We have a threshold issue because your certificate of appealability only goes to the Miranda issue, does it not? No, it includes the — it includes voluntariness. Well, my notes say that there are several issues that were not raised. That's true. Within the COA. Two Miranda sub-issues. Let me get my — The COA clearly includes the voluntariness issue. And if I can find that very quickly. That's fine. That's fine. The two issues that weren't included, there were three Miranda issues that were argued. One was the insufficient warning. One was the defendant's invocation when he said, we're done, we're done, we're done. And the third one was — Now, on the we're done, we're done, I assume you're raising that as a suggestion that he no longer wishes to talk without counsel. That he wanted to terminate the interrogation, correct. Yes. Well, again, looking at the videotape, we're done, we're done was stated by the detective. The detective is the one that said, we're done, we're done. Well, the detective said it first. Yes. And then Mr. Thomas repeated it. That's correct. But it's hardly an initiation of a statement that I no longer want to talk with you, detective. I want a lawyer, detective. It's almost the reverse. The detective is saying, well, this is over. We're not going to talk anymore. If you're not going to talk, we're not going to talk anymore. I don't want to spend a lot of time on that, because that is one of the uncertified issues, Your Honor. But I would just respectfully disagree again with your interpretation, although I will concede that that's not one of the stronger issues in the case. Well, what is your strongest issue that you want to advance here tonight? I believe the strongest issue is the voluntariness issue, which is included within the COA and encompasses to some extent the adequacy of the Miranda warning, because whether there's a Miranda warning or not is part of the totality of the circumstances test that this Court is supposed to consider in determining whether the confession was the product of a free will and rational intellect. And in this case, the police officers first softened him up and elicited a commitment to talk. They said to him, before they ever warned him, are you okay talking with us? And he said yes. And then they said again, you've got no problem? And he said yes. Then they gave him the warning and they said, well, this is no big deal. I'm sure you've seen these things on TV before. And, you know, this is just kind of a formality that we have to go through before we talk to people. And they didn't tell him of his right to have counsel present during, before, and during the interrogation. And the reason that this case is different than Frankson and all the other cases cited by Judge Minnell in her district court opinion is in none of those cases were those sort of truncated Miranda warnings given partway into the interrogation process. All of them were given pretty much immediately upon arrest. Why should that make a difference? Because the, because once the police detectives first have started talking to him, and I think this kind of goes to, and this isn't cited in the papers because it was handed down about a couple days before I filed my reply brief, but it goes to some of the same issues that the Supreme Court identified in Siebert versus Missouri. Once the police officers have talked to him for a while, the idea that he can just sort of stop things is really watered down because he's already talked to them and he's actually even promised them that he's going to agree talking to them before they've told him, you have a right to consult with an attorney and make, and talk to this person to make a decision whether it's a good idea to speak with us or not. And in the other cases, because they give the warnings at the very beginning of the interrogation, it's much clearer intention to the defendant who's being interrogated. Your rights take effect right now. You have the right before we ask you any questions whatsoever. And that's the way Miranda states it. It has to be said before any questioning begins. That's the language of Miranda. It doesn't say 20 minutes after you have chit chat. It doesn't say half an hour after you talk about things like the weather or the movies or anything like that. It says before any questioning begins, they must, the defendant must be told of his right to have a lawyer. Is there any inculpating statement made before the Miranda warning was given? There's not. But as a. Smooth, isn't it? No, it's not actually, Your Honor, because Miranda says it doesn't matter whether it's incriminating or non-incriminating statements. The defendant has the right to be warned before he's given his, before he's asked any questions. And the totality of the circumstances show that he's just being sort of led down this path to say, oh, you know, it's not a big deal. You need to talk to these police officers. And then they start trying to work him and seeing if they can get him to talk about this robbery murder that's happened in his neighborhood. And they can't get any. This isn't somebody who's unsophisticated. This is somebody who's been around, who's had experience with the law. They've never been arrested, but he's been involved in other kinds of activities that would be breaking the law. And so he wasn't afraid of these officers. He wasn't in fear of them. He was completely calm. And when you look at the tape, he's sitting back talking with him. In other words, he's not somebody who's been put in fear or somebody they're pressing against the wall and feels he must answer their questions. Matter of fact, he told him, go out and see so-and-so or go, go ask that person. And he even accused Mr. Prescott of having turned him in. So he wasn't somebody who was just taken off the street and who's a naif, an innocent naif, brought in before the police and they're leaning on him. With all due respect, Your Honor, I disagree. It's certain that he admitted during the interrogation that he had smoked marijuana. That's illegal. Tons of people do it. He admitted during the interrogation that he had possessed a gun probably illegally, but that doesn't mean he's somebody who's been around the block. And one of the things that you need to take into consideration under all the Supreme Court precedent is not only whether someone's been involved in criminal activity before in their life, but whether they've got, had involvement with the, with the court system and with the police before. And he hasn't, he's never been arrested before. In addition, he was, I'm sorry, let me go over to you. Is it your position that he was frightened with when he was with the officers? He was intimidated by them. Yes. I don't know, shaking in his boots, maybe not, but was he intimidated? Yes. And on the tape, because he confronts them a number of times. Correct. And even tells them what they can do or go about doing certain things. And he doesn't seem to be pressured by them at all. Correct, Your Honor. To a certain extent, he certainly pushes back with them for an extended period of time. And if I can just read the court a brief quote from Miranda. Whatever the testimony of the authorities as to waiver of rights by an accused, the fact of lengthy interrogation or incum, before a statement is made, is strong evidence that the accused did not validly waive his rights. In other words, the longer it takes the cops to get a confession, the stronger the evidence that they had to do something untoward to get it. And if you look at the facts in Spano versus New York, which is cited in our brief, that guy pushed back at the cops for, I believe, days, certainly hours and hours and hours. And his friend, who eventually extracted the involuntary confession from him, by telling him that he was going to lose his job as a police officer, had to go in and talk to him, not once, but two or three times, before he was able to get the confession out of that defendant. So the fact that somebody pushes back at the authorities who are interrogating him is not evidence that they're not being coerced. Quite to the contrary, it's strong evidence, per Supreme Court precedent, that the cops had to resort to increasing sorts of tricks and coercion and that they were able to extract a confession from the person. And if you look at the totality of this tape, first the police officers start off with the lies. They say, well, we got a utility person who saw you in the neighborhood. That's not true. We've got a mailman who saw you in the neighborhood. That's not true. The victim gave a dying declaration, putting you in the house. That's not true. We've got your DNA in the house. That's not true. And they keep piling lie upon lie, and it doesn't get anywhere. So then, after the lies are insufficient to extract a confession, then they start with the actual threats, which are sort of, they're both sort of dual threats and promises of leniency. This is the golden opportunity you have. You have to make a decision right now where you want to go. Where do you want your life to go? Where do you want to be five years from now? Well, confessing to robbery isn't going to make him get out of jail five years from now or not. In fact, all he ever did was confess to robbery. He never confessed to participating in a murder, and he was tried for a death penalty case. You can kiss your family goodbye. You're not going to be on the street. What is the death penalty? What is life without parole? You're going to kiss your whole life goodbye only because you're sitting here stubborn. And that refers to the sort of quid pro quo that Judge Clifton talked about during the earlier argument, where he's being told, you're going to kiss your life goodbye because you're being stubborn, the clear implication being if you confess, you're not going to kiss your life goodbye. That's both a threat and a promise of leniency. You're a pooh butt. What's your best case that this line of questioning is a violation of Miranda? There's, I couldn't find, I didn't find any Supreme Court cases that I cited in my papers that had anything approaching the level of threats in this case. In Linnum, which we cited, all the woman was told is you're going to lose aid for your children, and your children are going to be taken away from you. Now, granted, I can tell you speaking as a mother, that's a pretty awful threat, but that's not the heavy duty, isn't it? It is fairly heavy duty, but she wasn't being told she was going to be executed if she didn't confess. As Mr. Thomas was told, Mr. Thomas was told, if you don't confess, you're going to be executed. The difference between him confessing and not was going to be the difference between him being laid down on the table, and having a couple of needles stuck in him, and something else. That's at page 733 of the reporter's transcript. I'm not exactly sure in the excerpt what that refers to. Although, again, I wouldn't want my kid taken away from me, but I think that would be a lot preferable to having my life taken away from me, or somebody telling me that I was going to be raped and sodomized in prison. I haven't seen that kind of threat put in any of the Supreme Court cases. In Sano, again, the guy was kept in custody for a number of different days, and his friend came in and said, I'm going to lose my job, and my wife and kids are going to suffer if you don't confess. This is head and shoulders above that case. It's not even comparable. You know, I think the closest thing out of this Court is Taylor Rematics. And very interesting to me, again, I think the thing that seemed to upset Judge Kaczynski and the rest of the panel in that case was that it seemed so clear to them that the 16-year-old who was involved in that, and again, Judge Weiner, this was a 16-year-old who had previous contacts with police. So he wasn't necessarily some innocent person who was just being ripped off the street, but he was taken in the middle of the night and being prevented from contacting his mother and from contacting his attorney. But there were none of the other same threats. They said that, I believe one of the detectives in that case jacked his finger in the kid's face and had a ring on it that said 187, which is, you know, California Penal Code for Murder. I don't see how that's any different than... If I recall, Taylor, and I may have it wrong, if I recall, Taylor, our panel made the point that there was a critical witness who had been entirely disregarded by the California courts, such that the California court fact-finding determination could not be treated as reliable. Set that aside, and then the panel went off to make its own factual findings. Do we have anything here that similarly would permit us to set aside what the state court said with regard to voluntariness or relevant factual findings with regard to Miranda? No. In our case, fortunately, we have a transcript of everything that got said during the interrogation, and clearly they didn't have that in Taylor v. Maddox. But I think what we do have is an extraordinarily unreasonable application of all the voluntariness cases from the U.S. Supreme Court. Actual circumstances comparable to those in Taylor, which would permit us to make — we can't set aside the factual findings of the state court, but would permit us to conclude that there's an unreasonable application of law. That's correct, Your Honor. And frankly, you know, the state court of appeal didn't make any particular factual determinations. I mean, they didn't sit down and say these statements were made or certain statements weren't made, or this young man was, you know, it did have a better education than the defense is alleging. I mean, all of those facts are relatively undisputed. The question is, is what is the legal significance of those facts and the voluntariness? And the state court's determination that police officers came dangerously close to, but didn't cross the line of promising leniency. And I have to say that determination, to the extent that this Court looks at that as a factual determination as opposed to a legal determination, is just wildly unreasonable. If, you know, the courts want to sanction this kind of police conduct, you know, I just find it very troubling because, again, I find it significantly less egregious than all of the Supreme Court precedents that we've cited in our papers. There's nothing that even comes close. Counsel, you may want to reserve some time. I would. Thank you very much, Your Honor. Let's hear from the government. Good morning, Your Honors. May it please the Court. Daniel Rogers, Deputy Attorney General for Appelli. First of all, to clarify, the question came up as to the certificate of appealability. My understanding is that the issues now properly before this Court are the softening up issue and the adequacy of the Miranda, specifically the advisal of the right to counsel. Just those two issues? And the third, the ineffective assistance of counsel for failing to raise the voluntariness claim. Has that been raised in the COA? My understanding is the last one, yes. However, the other two issues, the softening up issue relating to the Miranda is not part of the COA, and the We're done? The But potentially, those factual issues arise with regard to voluntariness. To the extent that the effectiveness of the Miranda warnings given can be one factor in concluding that a statement was voluntary, put into the context here, I think we can fairly consider those facts as to how effective the Miranda warnings were in weighing whether or not defendant or Mr. Thomas was involuntary, spoke involuntarily or voluntarily. Certainly, as one factor in the totality of the circumstances test, I think those could be looked at. However, I think that's a far cry from using those independent bases upon which to grant petitioner relief. But as for the voluntariness of the confession, the State court, in its opinion, did make certain factual findings after what it characterized as its meticulous review of the videotape. And the videotape is part of the record, as the court indicated. It has seen the videotape, and it speaks far more eloquently to the accuracy of the State court's characterizations of what is on the tape than any advocate could. This quite simply is not the sort of brutal, coercive interrogations that have been found in prior cases to have resulted in involuntary confessions. First of all, the interrogation begins at about 7.04 p.m. and concludes at 10.47 p.m. So you've got less than four hours. During that time, appellant receives two 12-minute breaks, almost half an hour of that nearly four-hour period, his time not spent in interrogation. He receives a Coke. There are numerous indications by the detective. He's asked if he's cold. He's asked,  eat. He was never told he could have an attorney present while he was being interrogated. You don't have to answer the questions. He could stop the interrogation. He was told that he had the right to remain silent. He was told that he had the right to an attorney. He was told he had the right to have the attorney present while he was being cross-examined. That's correct. I believe, however, that, and as the State court found in relying on the Fourth and Eighth Circuit cases, that within that type of advisal, because there's no qualification placed on when the right to have an attorney attaches, that a reasonable person would understand that to mean that as soon as you're informed of that right, that is when it begins. Now, I understand that this Court, in a direct appeal case, U.S. v. Nody, took the contrary and the minority view that further clarification on that point is necessary. However, as this Court identified in Nody itself, I believe at page What's your spelling of Nody? N-O-T-I, right? N-O-T-I, correct. I believe at page 615, it was a closed case. There was no United States Supreme Court precedent directly on point. Miranda does identify what rights the defendant has, but the Supreme Court has expressly declined to indicate how those rights are to be communicated, to provide any talismanic incantation of Miranda. And so, in light of that ambiguity, this Court in Nody, in a direct appeal case, acknowledging that it is a closed call, shows, to follow the minority position, that further clarification that the right to counsel has to be clarified, that the right to counsel attaches at the time of, prior to answering any questions, is necessary. So this is an ENPA case, and it's not unreasonable for the State court to rely on Fourth and Eighth Circuit cases, notwithstanding the fact that the Ninth Circuit case has a slightly higher standard. Is that your argument? Correct. And I think the Ninth Circuit itself, in identifying that it's a closed case, reasonable jurists can differ on this point. Reasonable jurists have differed on this point. And for this Court to find that not following Nody would essentially be an unreasonable application of U.S. Supreme Court precedent would be tantamount to saying that the other Federal Circuit courts that have followed the other position have been acting unreasonably in light of the United States Supreme Court precedent. And I think even Nody indicates that this Court would not go that far. It's a closed case. However, the other thing that I would mention, just very briefly to address the softening up issue and the interrogation, they begin speaking to him at 7.04. And he's provided with Miranda at 7.24. During that time, Miranda, I always learned in criminal procedure that Miranda applies to custodial interrogation. They're not interrogating him in those 20 minutes. They ask him his shoe size. They talk about how big his feet are. Probably right until you get to about the last two minutes before the warnings are given. And the last two minutes is the sort of commitment to talk discussion and don't listen to what I'm about to say discussion. So, you know. I don't think, I think characterizing it as the detective saying don't listen to what I'm going to tell you is going on too far. That's not important. You've heard it before. You don't have to pay attention to this. Well, the idea that he's heard it before, the detective does indicate that I have to inform you of your rights before I can talk to you. The detective then provides him the Miranda. The detective then says, you understand what I just told you? And the detective asks, do you want to talk? Now, he had previously. Or he said, you don't have any problem talking with us, do you? Something like that. I mean, there was some commitment made to continue the dialogue. And by the by, I got to do this. So the momentum was built up to at least some extent. It may have been most of the conversation prior to the warnings. Idle chatter. But there was a purpose to some of the discussion immediately before the warnings. Well, it is what it is. It is. And the I don't think in the totality of the circumstances that there is a basis to believe that the defendant did not. Believe that Miranda applied or that those rights existed or that he had the ability to invoke those rights simply because the detective. Asked him immediately prior to giving him Miranda, you know, do you have any problem talking to us? Maybe he could have had a problem talking to them unrelated to Miranda. He won't. Who knows? As as Judge Clifton said, it is what it is. With regard to the other circumstances that the state court looked to in its voluntariness analysis. You know, this. The tape is the best evidence of what happened, and the detectives did make statements on the tape. The state court acknowledged the very same concerns that Helen is raising. I would say that the state court perhaps gauge engaged in a little hyperbole when it. Talked about coming dangerously close to promising leniency, things of that nature. The state, the detectives, for instance. The statement that about the getting a couple of needles in your arm. To want something and go in and push an old lady down to get and walk out and then that's it is a whole lot different than going in there premeditatedly going in and knowing that you're going to kill that lady and then taking your stuff. Now you're talking like laid out on the table and take a couple needles. OK versus OK, then what happened? What the shit went on? They said things to encourage him to talk. Yes. And I think it could fairly be said that some of the things were directed to make him think you'll do better if you talk and tell us what happened. The result of his talking was being tried for first degree murder and convicted and being faced with the prospect of the death penalty, which jury elected not to give him. But any of the good things that he thought might come from talking certainly didn't seem to come his way. Well, the characterizations that the detectives repeatedly made is what are you going to tell 12 people? What are you going to tell the jury? Yes. I don't think the detectives ever indicated that he would receive lesser charges, something of that nature. They kept saying, you know, what how will you explain what you did to these 12 people? What are they going to think? Are they going to think you're a cold killer or are they going to think you're somebody that went in to steal an old lady's stuff and she died? I think the detectives' promises of leniency, either expressed or implied, have to go for it. There has to be some express benefit out there that the defendant could seize on for a promise of leniency to overcome someone's free will. It isn't only what they said. It's their demeanor. At some points they became very angry. It looked like they were going to press in on him. When you watch the videotape, it looks like they're getting very close to him. It could be very frightening to somebody. These people are armed. He's sitting in their territory, not his own, and they're pressing him very hard to get the answers that they're seeking. And they're skilled at doing it because I'm sure they've done it more than once. Correct. They're both very experienced detectives. However, there is the flip side to that. There is their demeanor, but there's his demeanor. And the videotape, as the state court noted, and the videotape supports this characterization, he's seated. At times he's leaning back, sort of reclined in his chair. He is, when they become heated with him, he gets heated right back. He challenges them. He is not just meekly sort of being led along the garden path. He's fighting them every step of the way. This is someone who is in full possession of his faculties throughout. And he's fighting for his life. He is being confronted with his conduct, and he is trying to do the best he can for himself. Because they've told him that he'd get the death penalty. That's correct. And I don't think that that was lying to him. Well, counsel, what about the actual lies that were indeed told by the detectives? There were at least three, were there not? About the utility man and the other witnesses and the dying declaration? I actually think there were more. The DNA, the utility man, the mailman, the dying declaration. Codefendant defessing or the other guy defessing? The codefendant being in the next room giving him up. However, if you look at the record of the videotape on multiple occasions, you don't have my DNA. He expressly says that. No, you don't. Nobody saw me out there because I wasn't there. Just taking what the detectives said separately just for the moment, is apart from the possibility that that's not cricket, is that illegal or is it sufficient to tip the voluntariness issue or affect the Miranda issue? I don't believe so, Your Honor. Why? I believe, again, it's a totality of the circumstances analysis. And you have to look at everything that happened. We can't parse out bits and pieces and look at them in isolation. These lies, fabrications, exaggerations, however you like to characterize them, of the police. Let's just say they're lies. The lies. I think in order for them to be of such a gravity that his free will is overborne, there has to be some indication that he believed them. Is that right? Is there some law to that effect? I don't know that there is specific case law that says that. However, I think in a totality of the circumstances analysis, in order for a defendant's confession to be involuntary, his free will has to be overborne. And here, these lies did not overbear his free will. He didn't believe them. And he indicated that to the detectives on several occasions. I think that really covers the remarks that I had regarding the voluntariness and the adequacy of Miranda. So unless the Court has further questions. No further questions from the Court. Thank you, Counsel. We still have some reserved time. I'm going to have to be quick. All right. The first point I'd like to make to the Court is that really the time, the length of the interrogation, although obviously that's a relevant factor, isn't always determinative. And in fact, one of the best cases, and I should have cited this to you before, Judge O'Scanlan, is Fulminante, where there's no indication of how long the questioning takes place. In fact, it's between two inmates who are imprisoned, and the one inmate says because Fulminante is an accused or a convicted child killer, accused child killer, I'll protect you from the other inmates if you tell me what happened. That's it. One promise, no indication of, you know, sitting in a little room for an extended period of time, one promise. That's enough to render the confession involuntary. Second of all, counsel said he thought that Mr. Thomas had not been promised lesser charges during this interrogation. In fact, he had. At the reporter's transcript at page 714, excerpt of record 190, one of the detectives says, let's keep it a property crime. Let's keep it a property crime. You just tell me it was a robbery and we can keep it a property crime. That is a promise of a lesser charge and, of course, is completely false as well, false legal advice, because under California law his admission to a robbery during the course of a murder submitted him to a felony murder rule. Third, although there are some uncertified issues that are briefed here, I have attempted to invoke rules, this Court's Rule 22-1E, to expand the certificate of appealability, to expand this Court's consideration of the issues to encompass all of the Miranda issues. And I've put in my reply brief that I certainly have no objection if the Court wants to consider any of those issues, soliciting additional briefing from the Attorney General on those issues. You know, I cannot find a Supreme Court case that is as egregious as this one. Fulminante, maybe, promise of protecting somebody who's been accused of a heinous crime, maybe. This young man was told, your co-defendant just confessed, he's going to be out in time to get new tattoos. Two minutes later this guy confessed. That is a threat and a promise of leniency. They were repeated and escalated throughout this two-plus-hour interrogation, and the statements were involuntary. Thank you very much, Your Honors. Thank you, Counsel. The case just argued will be submitted for decision, and the Court will adjourn. All rise. This Court will discuss and adjourn. Oh, please.
judges: Reinhardt, O'scannlain, Clifton